IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*v.*<br>BRITTANY HUDSON | Criminal Action No.<br>1:23-CR-131-MLB-RDC |

**United States' Sentencing Memorandum**

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Stephen H. McClain and Angela Adams, Assistant United States Attorneys for the Northern District of Georgia, files this Sentencing Memorandum in preparation for sentencing on August 26, 2026, at 10:00 a.m., in the above-captioned matter. For the reasons stated below, the Court should find that the applicable offense level is 38. Because Brittany Hudson has a criminal history in Category I, the applicable advisory Guidelines range would be 235-293 months. The United States believes that a Guidelines sentence of 262 months is appropriate. Indeed, even if the Court were to find that a different Guidelines range applies, a sentence of 262 months is reasonable under all of the statutory factors set forth in 18 U.S.C. § 3553(a). Hudson well deserves a greater sentence than her partner-in-crime, Kayricka Wortham, who received a total 204-month sentence. A sentence of 262 months for Hudson is fair, just, and reasonable under the circumstances.

## I. <u>Background</u>

On March 13, 2026, after a five-day trial, Brittany Hudson was convicted on 30 counts, which included counts related to fraud, money laundering, and forgery. As detailed in the PSR, the trial evidence established that Hudson, Kayricka Wortham, and others created fake vendors in Amazon's system and submitted bogus invoices for payment by Amazon. (PSR ¶¶ 22-32). The evidence further established that the fictitious invoices that Hudson and her co-conspirators submitted totaled $10,673,494.89. This caused the company to pay approximately $9.4 million to bank accounts controlled by Hudson, Wortham, and others involved in the scheme. (PSR ¶¶ 21, 32, 47; *see also* GX 1).

On September 29, 2022, Hudson was initially charged, via a Criminal Information, for her role in the Amazon fraud scheme. (*See* Case No. 1:22-CR-362). She was released on a $5,000 unsecured bond with no pretrial supervision. (PSR ¶ 12). While on bond, in December 2022, Hudson and Wortham sought to purchase and operate a CRU hookah lounge franchise in the Atlanta area. (PSR ¶ 50). As a part of the purchase process, Hudson submitted fraudulent bank records purporting to show that she and Wortham had the financial ability to manage the franchise successfully. (GX 28A). In the due diligence process, CRU became aware of Wortham's and Hudson's criminal charges stemming from the Amazon fraud. (PSR ¶ 50). CRU scheduled a video call with Hudson and Wortham on January 23, 2023. (*Id.*). During this call, Hudson and Wortham falsely stated that their charges had been dropped. (*Id.*). CRU told Wortham and Hudson that they needed to provide documentation to confirm that the cases

had in fact been dismissed. (PSR ¶ 51). On January 27, 2023, Hudson sent an email to CRU attaching a fraudulent court document entitled, "Government's Motion and Order for Dismissing Case as to Defendant Brittany Hudson," purporting to dismiss her criminal case. (PSR ¶ 53). The fraudulent court document included the signature of Chief Judge Timothy C. Batten, Sr., the Court's stamp, and the name of the Clerk of Court. (*Id.*). The evidence at trial established that this document was fraudulent, having never been issued in Hudson's case. (*Id.*).

On October 7, 2025, a grand jury sitting in the Northern District of Georgia returned a 30-count Second Superseding Indictment. The superseding indictment charged Hudson with offenses related to the Amazon fraud, the fraud against CRU, and the forgery of Judge Batten's signature. After a five-day trial, a jury convicted Hudson of every count in the indictment. With respect to the Amazon fraud, Hudson was convicted of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and fifteen counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Hudson was also convicted of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and nine counts of money laundering, in violation of 18 U.S.C. §§ 1957 and 2. In connection with the CRU fraud, Hudson was convicted of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and two counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Finally, Hudson was convicted of one count of forgery of the signature of a federal judge and seal of a Court of the United States, in violation of 18 U.S.C. § 505.

## II. The Probation Office's Calculated Guidelines Range

The PSR calculates Hudson's Guidelines in two groups. The first Group calculates Hudson's Guidelines for convictions of conspiracy to commit wire fraud (Counts 1 & 27), wire fraud (Counts 2-16, 28, 29), and forgery of signature of federal judge and seal of the Court (Count 30). For this group, the PSR calculates Hudson's Guidelines as follows:

- The base offense level is 7 pursuant to U.S.S.G. § 2B1.1. (PSR ¶ 83).
- Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), the offense level is increased by 20 because the loss is more than $9,500,000 but less than $25,000,000. Specifically, loss in the amount of $10,673,494.89 is attributed to Hudson. (PSR ¶ 84).
- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), the offense level is increased by 2 because the offense involved 10 or more victims. Specifically, this offense involved the use of individuals' personal identifying information to create vendor accounts and bank accounts for at least thirty-eight fraudulent vendors. (PSR ¶ 85).
- Pursuant to U.S.S.G. § 2B1.1(b)(11)(C), the offense level is increased by 2 because the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification. Specifically, this offense involved the illegally obtained personal identifying information of at least 20 individuals to create vendor accounts. (PSR ¶ 87).

For this group, the PSR calculates an adjusted offense level of 31.

The second group calculates Hudson's Guidelines for convictions of conspiracy to commit money laundering (Count 17) and money laundering (Counts 18-26). For this group, the PSR calculates Hudson's Guidelines range as follows:

- The base offense level is 31 pursuant to U.S.S.G. § 2S1.1(a)(1). (PSR ¶ 93).
- Pursuant to U.S.S.G. § 2S1.1(b)(2)(A), the offense level is increased by 1 because the defendant was convicted under 18 U.S.C. § 1957. (PSR ¶ 94).
- Pursuant to U.S.S.G. § 3C1.3, the offense level is increased by 3 because a statutory sentencing enhancement under 18 U.S.C. § 3147 applies. In this case, the defendant was on federal release for the offenses charged in case 1:22-CR-362 when she committed the offense against CRU. (PSR ¶ 97).

For this group, the PSR calculates an adjusted offense level of 35. After applying a 2-level downward adjustment for zero-point offender, the total offense level is 33.

Both parties have lodged objections to Probation's Guidelines calculation. For the reasons outlined below, the United States objects to Probation's calculation because no role enhancement was applied. The United States believes that a 4-level enhancement for role, pursuant to U.S.S.G. § 3B1.1(a), should apply.

Hudson has lodged a plethora of objections to the PSR. Most of her objections do not affect the Guidelines range, seek to relitigate issues that have already been addressed, and rehash arguments related to her *Kastigar* challenge. The United States does not address these objections. The United States does address Hudson's objections to the Guidelines calculation and relevant factual findings.

## III. Hudson's Objections to the Guidelines Should be Overruled.

### A. The PSR Correctly Attributes $10,673,494.89 in Loss to Hudson.

The PSR correctly determined that the amount of loss attributable to Hudson is $10,673,494.89. (PSR ¶ 84). Hudson objects to the loss amount and argues that she should be responsible only for the $1,138,309.09 that flowed into accounts for which she was the signatory. This position ignores the trial evidence along with well-established law and Guidelines principles. A defendant in a conspiracy is accountable for all reasonably foreseeable losses caused by co-conspirators, and for all relevant conduct, regardless of whether every act was personally undertaken. *See* U.S.S.G. § 1B1.3; *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010).

Section 2B1.1(b)(1) of the Sentencing Guidelines governs loss amount. Generally, loss is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(A). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1)(C)(i). Intended loss means "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1(b)(1)(C)(ii). In calculating loss, the court must look at the relevant conduct. *See, e.g.*, *Mateos*, 623 F.3d at 1370; *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014); U.S.S.G. § 1B1.3(a)(1). Relevant conduct is defined as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and in the case of "jointly undertaken criminal activity," includes the acts of others that were done in

furtherance of the criminal activity and were reasonably foreseeable. U.S.S.G. § 1B1.3(a)(1).

The evidence presented at trial clearly demonstrated that Hudson was centrally involved in a jointly undertaken scheme with Wortham and others and that the actions of her conspirators were reasonably foreseeable to her. The records from Amazon established that the invoices submitted to Amazon in the name of fake vendors totaled $10,673,494.89. (*See* GX 1). Forensic Auditor Daniel Vest testified that the money paid by Amazon was deposited into accounts directly controlled by Hudson, Wortham, and their co-conspirators. (*See* Trial Tr. at 379-504). Special Agent Matthew Oltman reviewed numerous text messages of Hudson and Wortham discussing the onboarding of fake vendors and the submission of fraudulent invoices. (*See* PSR ¶ 31; Trial Tr. at 835-1040). Hudson knew that others, including Wortham, were engaged in conduct to further the fraud scheme. In fact, after Wortham left Amazon and could no longer use her access to approve fake vendors, Hudson wanted to make sure the scheme continued. She asked Wortham in a text, "are you going to get Jamar [another Amazon employee] to run more invoices?" (GX 308). Tellingly, every fake vendor that was used as a part of the fraudulent scheme—and whose invoices make up the $10,673,494.89 in loss—was approved either by Wortham or Jamar James. (GX 308; Trial Tr. at 310, 312).

Moreover, Hudson's argument that she should be held responsible only for money that she received in accounts with her name on them conflicts with the trial evidence. Clearly Hudson understood that the scheme generated losses far

greater than the amounts she received in those accounts because her own lifestyle reflected it. Hudson benefitted from the fruits of the fraud that flowed to Wortham's accounts, as these proceeds were used to purchase Hudson's vehicles and home. (*See* GX 18; GX 19; GX 22). Because Hudson's argument is unsupported by law and contradicted by the trial record, the Court should overrule her objection.

B. The Enhancements Under U.S.S.G. § 2B1.1(b)(2)(A)(i) and 2B1.1(b)(11)(C) Apply.

The 2-level enhancements under both § 2B1.1(b)(11)(C) and 2B1.1(b)(2)(A)(i) are applicable. Both enhancements are predicated, at least in part, on the unauthorized use of individuals' means of identification. First, Section 2B1.1(b)(11)(C) states that a 2-level enhancement should be applied when an offense involves "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." The Guidelines also require a 2-level increase if the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). A "victim" for the purposes of this enhancement can include "any individual whose means of identification was used unlawfully or without authority." *Id.*, cmt. n.4(E).

Hudson argues that she should not receive either enhancement because co-conspirator Demetrius Hines, rather than Hudson herself, supplied many of the stolen identities (i.e., the means of identification) used to create fake vendor accounts. Here again, Hudson overlooks the controlling principle that, in a jointly undertaken criminal activity, the Court should consider *all* acts and

omissions within the scope of the conspiracy that furthered the criminal activity and were reasonably foreseeable. U.S.S.G. § 1B1.3(a). Moreover, both enhancements focus on the circumstances of the *offense* as opposed to the defendant's specific conduct in the scheme.[1]

The PSR correctly notes that the Amazon "offense involved the use of individuals[‘] personal identifying information to create vendor account and bank accounts for at least thirty-eight fraudulent vendors and payee accounts." (PSR ¶ 85). The trial evidence established that Hudson herself used the personal information of her father, Samuel Hudson-Bey, and her mother, Angie Mobley, to create fictitious vendors—iPress Ink and Tenacity Services—without their knowledge or consent. (*See* GX 1). At trial, Samuel Hudson-Bey testified that neither he nor his wife owned the companies and received no payments from Amazon. (Trial Tr. at 534-35).

The evidence further established that when Hudson and Wortham ran out of names they could use to create fake vendor accounts, Demetrius Hines purchased stolen identities to continue the fraud. Hines testified that he

---

[1] Section § 2B1.1(b)(11)(C) applies "[i]f the offense involved . . . the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification," and § 2B1.1(b)(2)(A)(i) applies "[i]f the offense . . . involved 10 or more victims." The Sentencing Guidelines explicitly indicate when an enhancement should be focused on the facts of the overall offense as opposed to a defendant's individual conduct. *See generally United States v. Alvarado,* 643 F. App'x 853, 858 (11th Cir. 2016)(discussing the 2015 amendment to the sophisticated means enhancement under § 2B1.1(b)(10) that specifically directed courts to focus less on whether the overall scheme was sophisticated and more on the defendant's conduct).

purchased 20-30 stolen identities (including names, phone numbers, emails, IDs, and Social Security numbers) from Jaquan Frazier. (Trial Tr. at 582-85). Hudson was aware of this conduct. In a text, Wortham sent Hudson the stolen driver's license and Social Security card of D.B., one of the identities purchased by Hines, and Hudson used that information to create a fake vendor account. (*See* PSR ¶ 31(c); GX 347A; Trial Tr. at 587-88). Hudson also discussed with Wortham a vendor account created using the name C.S., another of the identities purchased by Hines, and Hudson kept an account of how much money was paid into that vendor account. (*See* PSR ¶ 31(e); GX 341; GX 330B; Trial Tr. at 587-88).

Because Hudson's offenses involved the use of stolen identities, the enhancement under § 2B1.1(b)(11)(C) is squarely warranted. And because each individual whose identity was used without permission qualifies as a victim, the offenses far exceed the ten-victim threshold under § 2B1.1(b)(2)(A)(i). Hudson's argument that only a limited number of fake vendor accounts are associated with her is immaterial; even if that were true, she is responsible for all reasonably foreseeable acts of her co-conspirators. *See United States v. Fleitas*, 766 F. App'x 805, 808–09 (11th Cir. 2019) (holding that because the defendant had 6 counterfeit credit and gift cards and his co-defendant possessed 16 counterfeit credit and gift cards, the district court did not err in calculating the offense had 10 or more victims and applying the enhancement under § 2B1.1(b)(2)(A)).

C. <u>The 3-Level Upward Adjustment Under U.S.S.G. § 3C1.3 Applies.</u>

Section 3C1.3 of the Sentencing Guidelines provides, "[i]f a statutory sentencing enhancement under 18 U.S.C. § 3147 applies, increase the offense level by 3 levels." 18 U.S.C. § 3147 states:

> A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense, to—
>
> (1) a term of imprisonment of not more than ten years if the offense is a felony; or
>
> (2) a term of imprisonment of not more than one year if the offense is a misdemeanor.
>
> The term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment.

While the precise nature of Hudson's argument is unclear[2], Hudson appears to suggest that an enhancement under § 3C1.3 does not apply because a conviction of some sort is required to trigger 18 U.S.C. § 3147 or the § 3C1.3 enhancement. If Hudson is arguing that § 3147 only governs release after a conviction, as opposed to pretrial release, she is incorrect. Section 3147 applies to "[a] person convicted of an offense committed while released under this chapter." The chapter referenced here is Title 18, United States Code, Chapter 207. This chapter includes § 3142, which applies to release of a defendant pending trial.

[2] Hudson also mentions Application Notes 4 and 5 of this Guidelines section. Section 3C1.3, however, does not have an Application Note 4 or Application Note 5.

To the extent Hudson claims that a separate conviction for a violation of § 3147 is required to trigger the enhancement under § 3C1.3, she is also incorrect. A defendant does not have to be convicted of § 3147 in order for § 3C1.3 to apply. *See United States v. Simpson*, 682 F. App'x 299, 303 (5th Cir. 2017) ("the reference in Guidelines section 3C1.3 to the section 3147 statute is meant to identify the conduct that triggers an enhancement, not make the enhancement depend upon a conviction under the statute"). In fact, Wortham, who did not receive a conviction under § 3147, received the 3-level enhancement under § 3C1.3 for forging Judge Batten's signature while on release for the Amazon fraud.

## IV. <u>The Defendant Should Receive a 4-Level Upward Adjustment for Having an Aggravating Role in the Offense.</u>

The Sentencing Guidelines calls for a 4-level enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G § 3B1.1(a). A 3-level increase is appropriate if a defendant was a manager or supervisor (but not an organizer or leader). U.S.S.G § 3B1.1(b).[3]

Factors the Court should consider when determining whether to apply a role enhancement include: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5)

[3] In order for a role enhancement to apply under these for subsections, the criminal activity must have involved five or more participants. The criminal activity here involved, at least, Wortham, Hudson, Demetrius Hines, Jamar James, and Laquettia Blanchard.

the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G § 3B1.1, cmt. n.4. "There is no requirement that all the considerations have to be present in any one case." *United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005). Instead, "these factors are merely considerations for the sentencing judge." *Ramirez*, 426 F.3d at 1356.

These factors support a role enhancement here. As noted in the PSR, Hudson and Wortham exchanged numerous text messages about the charged offenses. The messages show that Hudson worked hand-in-hand with Wortham planning, managing, and organizing their crimes. The messages also show that Hudson exercised decision-making authority, and she participated extensively in the organization and commission of the wire fraud and money laundering offenses. For example:

- On January 19, 2022, Hudson and Wortham discussed the need for personal identifying information to set up accounts. Hudson told Wortham that she needed a Social Security number to set up another account. Wortham also asked Hudson to submit an invoice. (*See* PSR ¶ 31(a); GX 342).
- On January 28, 2022, Hudson sent Wortham a text message with a ten-digit code and told Wortham it was for a Georgia account. Hudson also sent a bank routing number to Wortham. Wortham sent Hudson the personal identifying information of two individuals. Hudson confirmed

fraudulent vendors had been input into the Amazon database. (*See* PSR ¶ 31(b); GX 347).

- On January 29, 2022, Hudson advised Wortham that two vendor names (Tenacity and iPress) had been input in the Amazon database and were ready to pay out. Hudson and Wortham also discussed other fraudulent vendors and their current statuses. (*See* PSR ¶ 31(c); GX 347).
- In February 2022, Wortham requested an email address for a fraudulent vendor account. Hudson responded that she could not find an email address on the documents she had in her possession. (*See* PSR ¶ 31(d); GX 351; GX 352).
- In March 2022, Hudson was at the bank trying to withdraw $100,000 but Bank of America froze two of her accounts. The bank told her Hudson that she needed to show documentation that she was employed with Alex and Caleb (fraudulent vendors). Hudson asked Wortham to create fake documentation because Hudson did not have her laptop with her. Hudson sent Wortham the information needed. (*See* PSR ¶ 31(e); GX 341A).

Other text messages introduced at trial further demonstrate Hudson's critical role in organizing and managing the scheme:

- GX 302: On March 22, 2022, Wortham asked Hudson, "U gonna drop invoices?" Hudson responded, "I did some already." Hudson went on to explain that she "only put in 8 for tenacity for weeks 5-12" and "[p]ut in

the 9 for ipress as well." Hudson inquired about whether she should put in more for Tenacity Services.

- GX 330B: On April 24, 2022, Hudson and Wortham discussed fake vendors used for the Amazon fraud. Wortham told Hudson that she (Wortham) would help Hudson with the paperwork. Wortham asked Hudson about the amount of cashier's checks that were issued in the name of certain fake vendors. Hudson replied, "Alex 180k Greer services 180k Caleb 20k." Hudson also stated, "I know Caleb got 27,438.60 Wilbon got 207,417.88 Domestic got 147,188.48."
- GX 308: On June 24, 2022, Hudson asked Wortham, "Are you going to get Jamar to run more invoices." As noted above, all of the fake vendors utilized as a part of this scheme were approved in Amazon's system by either Wortham or Jamar James.

The evidence presented at trial also showed that Hudson enjoyed a large share of the fruits of the crime. For example:

- GX 352: On February 12, 2022, Hudson sent Wortham the listing for the home at 4161 Weaver Street (i.e., the $928,000 home purchased with the fraudulent proceeds).
- GX 329: On April 9, 2022, Hudson and Wortham discussed the purchase of a pool for the house the two acquired with the fraudulent proceeds. Hudson, who was spearheading the purchase of the pool, stated, "need to run some invoices for this damn pool. Just got the estimate."

- GX 305, GX 331: Messages in May and June of 2022 show that Hudson and Wortham discussed the use of shared vehicles. These messages specifically show they shared use of a Durango, Lamborghini, and Power Wagon.

The evidence presented at trial also shows that Hudson recruited others in the schemes:

Michael Mitchell

- On March 23, 2022, Hudson sent Wortham a text message stating that she had a cousin she could recruit into the scheme but he would likely want half of the proceeds. Wortham replied that he would not know the exact amount of the proceeds so they could tell him any amount. Hudson agreed with Wortham's suggestion. Wortham advised that she needed his information as soon as possible so she could enter his information into the database. Hudson responded by sending Hudson a fraudulent business named Logical Logistics with an email address. A few days later, Wortham asked Hudson for a name associated with the fraudulent business. Hudson replied with the name Michael Mitchell (Hudson's cousin). Hudson also indicated she had to complete the setup, but her cousin was backtracking because he was concerned about taxes. (*See* PSR ¶ 31(g); GX 328). On April 1, 2022, a business in the name of Logical Logistics & Transportation LLC was registered in Florida. (GX 416). Michael E. Mitchell III was listed as the CEO at his Daytona Beach address, and Brittany Hudson was listed as the manager. (*Id.*). Logical Logistics was onboarded as a fake vendor with

Amazon and, as a part of the scheme, submitted $114,000 in fraudulent invoices. (GX 1).

Angie Hudson

- On March 11, 2022, Wortham began a text conversation with Hudson discussing a bank account in her mother's (Angie Hudson) name. Wortham and Hudson discussed how Wortham should withdraw cash from her bank accounts. Hudson told Wortham to hold off on sending the money because her mother was "freaking out" about where the money was coming from. Hudson indicated she was going to close the bank accounts that had her mother's name on them. (*See* PSR ¶ 31(f); GX 341).
- Notably, one month later, on April 11, 2022, Angie Hudson withdrew $250,000 of the fraudulent proceeds from one of her accounts. (*See* GX 104 at 28).

This text exchange shows that Angie Hudson was concerned about the nature of the money being deposited into her accounts. Thus, when Angie Hudson made a withdrawal using the proceeds of the Amazon fraud in April 2022, she knew or was deliberately ignorant of the fact that the money came from some form of unlawful activity.

In sum, the evidence shows that Hudson played an aggravating role, acting hand-in-hand with her partner-in-crime, Wortham, to organize and manage the scheme. She directed Wortham in some instances by telling Wortham what information was needed to onboard fake vendors, instructing Wortham to create

fraudulent documents when necessary, and—through Wortham—managing Jamar James to submit invoices. Hudson exercised decision-making authority, participated extensively in the offense, helped plan and organize key aspects of the scheme, and enjoyed a large share of its proceeds. *See United States v. Bennett*, 143 F. App'x 200, 203 (11th Cir. 2005) (applying three-level aggravating role enhancement where the defendant "helped plan the robbery with codefendant . . . also tried to recruit a friend to help in the robbery, directed the actions of Young during the robbery and, along with Young, received a greater share of the proceeds than did the other participants.").[4] Indeed, recruitment alone is sufficient to sustain a role enhancement. *See United States v. Cunningham*, 537 F. App'x 878, 880 (11th Cir. 2013) (citing *United States v. Thomas*, 446 F.3d 1348, 1355 n. 2 (11th Cir.2006)). Hudson was one of the two principals running this scheme.

## V. <u>United States' Proposed Guidelines Calculation</u>

For the reasons stated above, the United States' proposed Guidelines calculation is as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2) | Base Offense Level | 7 |
| 2B1.1(b)(1)(K) | Loss | +20 |
| 2B1.1(b)(2)(A)(i) | Number of Victims | +2 |

[4] Because the United States believes Hudson should receive an aggravating role enhancement, it objects to Probation's conclusion that she qualifies for a zero-point offender reduction under § 4C1.1. That provision allows for a 2-level decrease only if, among other requirements, "the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role)." U.S.S.G. § 4C1.1(a)(10). If the Court agrees that a role enhancement under § 3B1.1 applies, Hudson is ineligible for the 2-level reduction under § 4C1.1.

| | | |
|---|---|---|
| 2B1.1(b)(11)(C) | Means of Identification | +2 |
| 3B1.1(a) | Role in the Offense | +4 |
| 3C1.3 | Commission While on Release | +3 |
| **TOTAL** | | 38 |

With a criminal history in Category I, Hudson's advisory Guidelines range would be 235-293 months.

## VI. United States' Sentencing Recommendation

The United States recommends a 262-month sentence. The statutory factors found in 18 U.S.C. § 3553(a) support the United States' requested sentence. Those factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment," "to afford adequate deterrence to criminal conduct," and "to protect the public," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

### A. The Nature and Circumstances of the Offense

The nature and circumstances of Hudson's offenses are serious, warranting a significant prison sentence. Hudson's criminal activity resulted in a loss of over $9 million. The fraud scheme that Hudson, Wortham, and their co-conspirators facilitated attacked the foundation of how any organization like Amazon functions: trust. Companies depend on employees to act honestly, to protect sensitive information, and to follow internal controls. Hudson worked with Wortham to manipulate the system and exploit access to information that

Wortham was entrusted with. This scheme, too, could not have been completed without the unauthorized use of individuals' personal identifying information. When a person's identity is stolen and misused, individuals are placed at risk for financial loss, privacy invasions, and long-term harm that can take years to remedy.

The seriousness of Hudson's criminal conduct is compounded by the separate fraud she committed against CRU—committed while on bond. She submitted fake documents, including falsified bank records and court records, to CRU in order to obtain two franchises.

Making matters even worse, the CRU fraud involved forging Judge Batten's signature, one of the most serious and brazen acts in this case. Trust in the legal system is paramount and that trust is predicated on authentic, trustworthy records reflecting the true nature of legal proceedings. Fabricating a federal judge's signature on court documents directly implicates the integrity of the judiciary and undermines confidence in the judicial system itself.

B. <u>The History and Characteristics of the Defendant</u>

The history and characteristics of Hudson strongly support the imposition of a 262-month sentence. She is not someone who turned to crime out of need or lack of opportunity; she is someone who chose fraud despite being financially secure. Prior to engaging in the instant fraud schemes, Hudson defied many odds and built a successful business. From 2019 to 2022, Hudson operated Legend Express, an Amazon DSP business, and made approximately $500,000 a

year. (PSR ¶ 135). Prior to that, she was an assistant basketball coach at two universities. (PSR ¶¶ 136, 137). Despite this success, Hudson chose crime.

Her behavior throughout this case demonstrates a continuous refusal to follow the law or respect judicial authority. While on bond, she attempted to defraud CRU and forged the signature of a federal judge. During the course of this litigation, she has filed dozens of motions aimed at impeding and delaying the proceedings and lodging frivolous attacks at law enforcement and the Court. She has also engaged in disruptive behavior that resulted in repeated contempt orders. Most notably, on the morning of trial, she simply chose not to appear, presumably, because she simply did not want to. And once trial did begin, she opened by making knowingly false statements and arguments to the jury, claiming she had been detained in an ICE facility and arrested without a warrant. (Trial Tr. at 296-297). Hudson's history and characteristics certainly militate toward a significant sentence.

C. <u>Deterrence</u>

The need for general and specific deterrence in a case like this is exceptionally high, further supporting the recommended sentence. A 262-month sentence would serve as needed deterrence for other individuals who might consider engaging in similar financial frauds, forgery of a judge's signature, federal crimes while on bond, and obstructive behavior during the course of litigation. Courts in this Circuit have "expressed the view that '[g]eneral deterrence is more apt, not less apt, in white collar crime cases."' *United States v. Oudomsine*, 57 F.4th 1262, 1267 (11th Cir. 2023) (citing *United States v. Howard*, 28 F.4th 108, 209 (11th

Cir. 2023)). "[E]conomic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence." *Howard,* 28 F.4th at 209. Significant federal prison sentences serve as an important deterrent to help discourage other would-be fraudsters and prevent the future victimization of companies and individuals alike.

This sentence would also serve as specific deterrence for Hudson. Her history in this case—including the commission of crimes while on pretrial release and impeding the litigation—shows that Hudson has no respect for the law. With a significant sentence, Hudson might think twice before committing new crimes.

D. <u>Unwarranted Sentence Disparities</u>

Wortham was sentenced to a total of 17 years' imprisonment for the same criminal conduct. She received 16 years for the Amazon fraud scheme in Case No. 1:22-CR-361 and an additional one year, to run consecutive, for forging Judge Batten's signature in the instant case. For the Amazon fraud, the United States recommended a 10-year sentence. The sentencing Court decided that a 16-year sentence more appropriately reflected Wortham's conduct in that case.

Wortham's sentence must be understood in the context of her posture throughout the proceedings. Wortham negotiated plea agreements in both of her cases, admitted her guilt from the outset, and fully acknowledged her role in the offenses. She also cooperated with law enforcement, providing information about other participants in the Amazon fraud, and earned a Section 5K sentence reduction. While she raised sovereign-citizen-type arguments at her first

sentencing hearing, she abandoned that behavior by the time she was sentenced in this case.

Hudson's conduct stands in stark contrast. She has repeatedly minimized her conduct and shifted blame to others. And she has been obstinate and disruptive in nearly every pretrial hearing. Wortham's limited disruptive behavior appears to have affected her sentence. Hudson's sentence should reflect the substantially greater degree of obstructive activity she engaged in throughout this case. Given Hudson's comparable role in the scheme, her refusal to accept responsibility, and her persistent obstructive conduct, a sentence exceeding Wortham's is warranted and necessary to avoid unwarranted disparities.

Other fraud defendants have received significant sentences in this district. Andrew Mackey (Case No. 1:10-CR-0310-WSD-JFK) went to trial and was sentenced to 324 months in prison. He ran an investment fraud scheme in which investors lost over $6 million. Mauricio Warner (No. 1:13-CR-0139-CAP-JFK) went to trial and was sentenced to 240 months in prison. He ran a stolen identity refund fraud scheme claiming over $5 million in fraudulent refunds. Qadir Shabazz (No. 1:13-CR-441-TCB-CMS) went to trial and was sentenced to 277 months in prison. He ran a stolen identity refund fraud scheme claiming over $12 million in fraudulent refunds. Bernando Davis (No. 1:13-CR-058-CAO-JFK) went to trial and was sentenced to 259 months in prison. He participated in stolen identity refund fraud scheme claiming over $19 million in fraudulent refunds. Stanley Kowalewski (No. 2:13-CR-045-RWS-JCF) went to trial and was sentenced to 209 months in prison. He ran an investment fraud scheme in which

investors lost over $11 million. Ephren Taylor (No. 1:14-CR-0217-WSD) pled guilty and was sentenced to 235 months in prison. He ran an investment fraud scheme in which investors lost over $16 million. Hudson's conduct is comparably egregious to these defendants, warranting a similarly significant sentence. As such, a sentence of 262 months is fair, just, and reasonable. It reflects the seriousness of Hudson's offenses, promotes respect for the law, provides appropriate deterrence, and ensures parity with a similarly situated defendant. For all these reasons, the United States respectfully requests the Court impose a sentence of 262 months.

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*

/s/STEPHEN H. MCCLAIN
*Assistant United States Attorney*
Georgia Bar No. 143186
Stephen.McClain@usdoj.gov

/s/ANGELA ADAMS
*Assistant United States Attorney*
Georgia Bar No. 613114
Angela.Adams@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record, and will serve a copy by sending it via Federal Express with sufficient postage to:

Brittany Hudson
24309-510
Robert A. Deyton Detention Center
11866 Hastings Bridge Road
Lovejoy, GA 30250

August 19, 2026

/s/ ANGELA ADAMS

ANGELA ADAMS
*Assistant United States Attorney*